## LONGMIRE *v.* FAIN. ·

### (*Knoxville.* November 7, 1890.)

1. BONDS, OFFICIAL. *Liability of sureties upon additional bonds. Clerk and Master.*

   Sureties upon additional bonds given by a Clerk and Master are jointly and severally liable, in the same or separate suits, with the sureties upon his original bonds to parties aggrieved by his official default, occurring either before or after the execution and approval of the additional bonds, where the latter bonds cover the entire official term, and were given, as provided by statute, pursuant to an order of Court made upon suggestion of insufficiency of the original bonds.

   Code construed: §§ 966, 967, 969, 970, 971 (M. & V.); §§ 778, 779, 781, 782, 783 (T. & S.).

   Cases cited and distinguished: State *v.* Polk, 14 Lea, 1; Bramley *v.* Wilds, 9 Lea, 674.

2. SAME. *Liability of sureties upon special receiver's bond made by Clerk and Master.*

   Sureties upon a special receiver's bond, given by the Clerk and Master upon order of the Chancellor to secure funds in a particular cause, are liable primarily, as between themselves and sureties upon the Clerk and Master's general bonds, for his default resulting in loss of the funds held by him in the particular case.

   Code construed: § 372 (M. & V.); § 330 (T. & S.).

3. CLERK AND MASTER. *Liability for default of visited primarily upon third persons other than sureties, when.*

   The drawer of a bank check in favor of the incumbent of the Clerk and Master's office becomes liable for the amount of that check to the creditors of that office, although the check was given without consideration and afterwards returned to the drawer, where it was furnished to be used, and was in fact used, by the Clerk and Master in lieu of cash in making his financial reports, whereby he was enabled to cover up his default and continue in office.

Longmire *v.* Fain.

4. SAME. *Same.*

And the liability of the drawer of the check is primary, in such case, as between himself and sureties on the Clerk and Master's several bonds.

5. SAME. *Exception to manner of preparing report.*

Where Master's report is otherwise regular, and no improper conduct is averred, an exception thereto, supported by affidavit, that one of the parties to the cause served as amanuensis in its preparation is not well taken.

6. SAME. *Same. Waiver.*

And such exception is waived by the failure, without sufficient excuse, to bring it to the attention of the Court until after final decree upon all other questions and exceptions.

---

FROM SULLIVAN.

---

Appeal from Chancery Court of Sullivan County. JOHN P. SMITH, Ch.

HAYNES & HAYNES and C. R. VANCE for Complainants.

C. E. LUCKEY and THOMAS CURTIN for Check-men.

TAYLOR & ST. JOHN and INGERSOLL & PEYTON for Sureties.

CALDWELL, J. On December 16, 1882, Will H. Fain was appointed and qualified as Clerk and Master of the Chancery Court at Blountville for

the constitutional term of six years. He executed the official and special commissioner's bonds required by Code (M. & V.), §§ 368 and 370, and took charge of the affairs of the office on that day.

In 1885 the grand jury of the county, after making the examination provided for by Code, § 383, reported that those bonds were insufficient. Whereupon, requisition was made by the Chancellor, under Code, §§ 966, 967, and two sets of additional bonds, of like penalties and conditions as the original bonds, were executed—one set on October 3, 1885, and the other on January 10, 1886.

On April 10, 1884, Fain was appointed special receiver in what is called "the Hopkins case," and executed a special receiver's bond in that case in the penalty of $3,000, and conditioned as required by law.

When making his financial reports, under Code, § 386, Fain, on two or three occasions in 1885 and 1886, filed and exhibited certain bank checks in lieu of cash that should have been on hand. These checks were drawn in his favor, as follows: One by George R. Barnes for $500; one by John M. Fain for $1,000, and another by A. H. Bullock for $1,150. After these checks had been so used, and served the purpose of passing Fain's account from term to term, he surrendered them, without consideration, to their respective drawers.

Finally, in October, 1886, Fain vacated his office by resignation, and made default to the extent of $6,010.65. The defalcation embraced funds in vari-

ous causes, "the Hopkins case" among them. Some of the funds were appropriated before and some after the execution of each set of additional bonds, and before and after the execution of the special receiver's bond in "the Hopkins case."

Anticipating litigation on account of Fain's maladministration of his office, several of his sureties made conveyances of their property.

The complainants in this cause are the persons entitled to the various funds converted by Fain. They filed this bill in September, 1887, against the principal and sureties on all the said original, additional, and special receiver's bonds, and against Barnes and others (called "check-men"), to recover the misappropriated moneys.

Defense was made, proof taken, account stated, and decree pronounced granting the relief sought in the bill. Several of the defendants have appealed, and assigned errors.

*First.*—Certain sureties on the additional bonds of October 3, 1885, and of January 10, 1886, submit and earnestly urge the proposition that they can, in no event, be rightfully held liable for any of Fain's defalcations occurring before they became his sureties.

The language of the decree on this subject is as follows: "That the sureties, as between the creditors and themselves, are jointly and severally liable for the full amount of the default, the additional bonds being merely cumulative, and covering the entire period of the Clerk and Master's incumbency."

The decree is right. As to the creditors of the office, the original and additional bonds are to be treated as a unit. They constitute a joint and several guaranty on the part of each and all the obligors for the benefit of all beneficiaries of funds coming to the hands of the Master during his entire term. This is the requirement of the statute and the obligation of the bonds.

The bonds of October 3, 1885, and of January 10, 1886, were executed under that article of the Code entitled: "Requiring new bonds or additional sureties from public officers." This title seems to indicate that other bonds may be given, or that other sureties may be added to the bonds already given, in any of the cases contemplated.

As to the *form* of the new bond, it is provided: "Such additional. bond shall be in the same penalty, conditioned, approved, and filed in the same office, as the first official bond, and under like penalties in case of failure." Code, § 969. The penalty and condition of the additional bond. are to be the same as those of the first bond, and the same liabilities are to follow a breach—the sureties on each are to be "under like penalties in case of failure." This means that the bonds are to be alike in form and also in legal effect.

Confessedly. the first bond, in this instance, by its terms and by the statute, covered the full time of Fain's incumbency. The additional bonds should have the same scope. We think they have, both in fact and in. law. In penalty and condition they

are identical. In dates they are different, of course. But the additional bonds recite that "the above bound Will H. Fain has heretofore been appointed Clerk and Master, * * * for the term of six years from the sixteenth day of December, 1882." This recital, without some limitation of the period to be covered by the additional bonds, indicates a purpose on the part of the obligors to comply with the statute, and bind themselves for the official delinquencies of Fain "for the term of six years from the sixteenth day of December, 1882."

With respect to the obligation of the new bond, the statute provides: "Every such additional bond is of like force and obligation on the principal and sureties thereon from the time of approval, and subject to the same remedies, as the first official bond." Code, § 970. The exact office of the phrase, "from the time of approval," is not clear. Two contrary interpretations are suggested by adverse counsel—one that it was intended to limit the liability of such sureties to defalcations occurring *after* the approval of the additional bond; the other, that it was intended simply to define the date at which the additional bond should become *operative,* and nothing more. Both views have the merit of plausibility; the latter is more consonant with the general purpose of the statute at large concerning additional bonds. This section may properly be transposed and read as follows: From the time of approval, every such additional bond

shall be of like force and obligation, and subject to the same remedies as the first official bond.

If "every such additional bond is of like force and obligation, * * * and subject to the same remedies as the first official bond," it must, of necessity, embrace the same period of time, cover the same defaults, and be subject to the same recoveries.

The correctness of the construction herein placed upon §§ 969 and 970 is rendered the more manifest by the next succeeding section, which defines the effect of the new bond on the old one in these words: "In no case provided for in any of the preceding sections of this article are any of the official bonds previously executed discharged, but each remains of the same force and obligation as if the additional bonds had not been given; and any person aggrieved can have his remedy upon either or all of such bonds, in the same or in separate proceedings." Code, § 971.

Here is a distinct and unqualified provision that *any person aggrieved* can have his remedy *upon either or all* of the original and additional bonds. No limitation as to time is imposed. Whether the default occurred *before* or *after* the execution of the additional bonds is entirely immaterial. In either case the person aggrieved has his right of action upon either or all of the bonds, at his election. If the officer has misappropriated money, the person entitled to it need not stop to inquire the date of the conversion, but may, in any case,

maintain his action on the original bond, on the additional bond, or on both of them; and he may sue on them "in the same or in separate proceedings."

Such is the meaning of the three sections in detail. Taken together they give emphasis to the conclusion that the additional sureties become bound for the official term as an entirety. It may be added that the object of the additional bond is to give further indemnity to those affected by the past conduct of the officer, as well as to afford greater protection to those who may be interested in the future administration of his office; and that the liability of the sureties on the additional bond is the same as if they had simply added their names to the original bond.

We do not hold, nor did the Chancellor, that the sureties on the several bonds were equally liable *between themselves.* Provision is made for the sureties as to each other in another section, as follows: "The sureties in either bond who have been compelled to make any payments thereon for the principal obligor, have the same remedies against the sureties in all the bonds executed at the time of the default as co-sureties on the same bond have against each other, the damages being properly proportioned according to the penalty of the several bonds." Code, § 972. Application of the remedies of this section is not sought in the present proceeding.

The case of the *State* v. *M. T. Polk et al.,* 14

Lea, 1, is not in conflict with our holding in this case. There the Treasurer of the State executed his official bond long after the commencement of his term, without any words of relation, and binding " each surety to the extent of ten thousand dollars, and no further." Suit was brought on that bond, and it was decided that the sureties thereon were liable for such funds as their principal had in his hands when the bond was executed, and such as were afterward received by him during his continuance in office, the liability not to exceed $10,000 as to each surety. The sureties were held not to be liable for funds received by the Treasurer *during his term*, but *before* the execution of the bond, *because* there was "nothing in the language of the bond of a retrospective character, and calling the attention of the sureties to the fact that they were binding themselves for the past as well as the future acts of their principal." 14 Lea, 7, 8.

That case was in no sense like this one. That suit was on an *original* and not an *additional bond;* hence, the law relating to additional bonds was not applicable, and was not applied. There was no other bond, in that case, *covering the entire official term* to which the statute or the Court could refer the bond in suit for its scope as to time and measure of liability. That bond mentioned but one date, and that was the date of its execution. It did not state when the official term began nor when it shall end. There was

26—5 P

nothing in its language " of a retrospective character."

In this case there are original bonds, which, *in terms,* cover the full period of six years, beginning December 16, 1882; and there are also additional bonds in the same penalty and condition, naming the same period, and, by the statute, declared to be of like force and obligation, and subject to the same penalties and remedies as the original bonds. Besides the statutory *relation* of these additional bonds, they contain words of a *retrospective character,* viz.: " Whereas, the above bound Will H. Fain, has heretofore been appointed Clerk and Master     *     *     *     for the term of six years from the sixteenth day of December, 1882," etc.

The case of *Bramley* v. *Wilds,* 9 Lea, 674, is no more an adverse authority. It is true that the surety on the new bond was there held liable only for defaults occurring *after* its execution; but that bond was not executed for the same purpose and under the same statute as were the additional bonds in the present case. In that case certain sureties on the first official bond had been discharged, and the bond sued on was given in lieu under the article of the Code embracing Sections 973 to 984 inclusive. There had been no report by the grand jury that the original bond was insufficient, no requisition by the Chancellor that additional bond be given, as in the present case. The original bond was presumably sufficient, and

the creditors of the office up to that time needed
no further indemnity than that already provided.
Two of the original sureties were permitted to
withdraw from the position of liability for the
*future* official conduct of their principal, and *as
to that* the new surety took their place, nothing
more.

*Second.*—The Chancellor decreed "that the re-
ceiver's bond in the case of ——— Hopkins was
cumulative, and that the sureties on Fain's general
receiver's bond are equally liable with the sureties
on said special receiver's bond to the creditors for
the funds in said cause."

It has already been stated that Fain executed a
special commissioner's bond, under Code, § 370, at
the beginning of his term, and that he afterward
executed additional bonds for the same purpose.
All these bonds the decree properly refers to
(there being no difference between *commissioner* and
*receiver* as used in Code, § 370), as "Fain's gen-
eral receiver's bond" as contradistinguished from
the "special receiver's bond" in the Hopkins case.

Certain sureties on these additional bonds, and
one of the sureties on this original bond, assign
error on that portion of the decree just quoted;
the former contending that they are not liable
for the funds in the Hopkins case: (1) Because
the default occurred *before* the execution of the
additional bonds; and (2) because those funds were
covered by the special receiver's bond, and none
other; and the latter joining in the contention

that those funds were secured alone by the special receiver's bond.

That the special receiver's bond in "the Hopkins case" was executed, and the funds misappropriated, *before* the execution of the additional bonds, can make no difference as to the liability of the latter bonds to the beneficiaries of those funds. So far as concerns the beneficiaries, the sureties on the additional bonds stand in the same attitude before the law as do the sureties on the first bond. The reasons for this conclusion have been given in a former part of this opinion, and need not be repeated here.

What that attitude is remains to be considered. The Chancellor held it to be the same as that of the sureties on the special receiver's bond in "the Hopkins case." This is an erroneous view. The first bond was intended "to cover property or funds" that might come to Fain's hands as special commissioner or receiver *in any case* (Code, § 370), and the additional bonds were given for the same purpose. The special receiver's bond executed in "the Hopkins case" was more limited in its scope, and different in penalty and condition. It was intended "to cover property or funds" in *a particular case*, did not relate to the first bond, and cannot properly be construed as an "additional bond" in the statutory sense. Code, § 966 *et seq.* This special bond was executed under a different provision, in these words: "The Court may also require special bonds to meet particular exigencies,

and in a suitable penalty, whenever, in its judgment, the interest of suitors renders it necessary, subject to the provision of the last preceding section." Code, § 372. Property had been attached and was to be sold in "the Hopkins case." To make safe that property and its proceeds, a special bond, in the penalty of $3,000, was required by the Court. "To meet the particular exigencies" of that case the special bond was given.

Beyond that case the sureties on that bond are liable for no default of their principal; in that case they are liable *primarily* for every default to the extent of $3,000. The other bonds having been given to cover property and funds *in every case*, the sureties thereon would have been liable for the default in "the Hopkins case" if the special bond had not been executed. The special bond did not discharge the other bonds in the particular case, but operated simply as a transfer of *primary* liability to the special bondsmen. After the exhaustion of that bond the other bonds are liable.

*Third.*—Several conveyances by certain of Fain's sureties were impeached in the bill for fraud, and were set aside by the Chancellor. His action in this behalf is by some assigned as error. We have examined the proof on this branch of the case, and are content to simply state the fact of our concurrence in the decree. A statement and discussion of the facts would be unprofitable.

*Fourth.*—Decree was pronounced against each of the "check-men" for the amount of his check with

interest.   They have assigned several errors, none
of which are well taken.   Without setting them
out formally and in detail, such of them as are
material will be considered.   These checks were
furnished to Fain without consideration, and, after
they had served their purpose to his satisfaction,
were returned on the same terms.   He filed and
exhibited them two or three times, as parts of
his financial reports of his office, in lieu of money;
.and they were by the Court, and by committees
appointed under Code, § 386, treated as so much
cash on hand.   So regarding them, the reports
were found to be correct, and Fain was permitted
to continue in office from term to term.   He says
that he was in great financial embarrassment, and
obtained these checks and used them that he
might "bridge over" his financial reports at each
term of the Court.   Bullock and John M. Fain
signed their checks in blank, and permitted him
to fill them up for any amount he might need.
Barnes filled his before signing.   From a very care-
ful consideration of the evidence, which is conflict-
ing in some respects, we have reached the con-
clusion that these "check-men" knew Fain's object
in requesting the checks, and the use to which
he in fact put them.

Under such a state of facts, we hold without
hesitation that each of the "check-men" became
indebted to the office for the amount represented
by his check.   That the law (Code, § 386) did not
authorize Fain to exhibit *checks*, but required him

Longmire *v.* Fain.

to report the amount of *money* belonging to his office, is an immaterial fact so far as the liability or non-liability of the "check-men" is concerned. They will not be allowed to hide themselves behind a violation of law in which they participated. It does not lie in their mouths to say that Fain imposed upon the Court and its committees time and again to the injury of suitors, and that they who enabled him to do these things must be excused because the strict letter of the law was not pursued. If he, in violation of law, brought these checks into Court instead of money, those entitled to the money represented became entitled to the checks representing it; and the persons furnishing these checks became bound to the office for their payment. That the checks were in fact never presented for payment, and that the drawers had no funds in the banks on which they were drawn, are likewise unimportant circumstances so far as the "check-men" are concerned. It was a part of the scheme of imposition and deception that the checks should never be presented for payment, but should be returned to the drawers when they had fully served their purpose. This was known to Fain and the "check-men" alone. As to all the world besides the transaction seemed to be *bona fide.*

Of no more advantage to the "check-men" is the other fact that the checks were drawn in favor of Will H. Fain *individually*, and not in his *official capacity*. They were drawn with the understanding that they were to be used as representing

money in connection with his financial reports of the business of his office, and they were so used by him and accepted by the Court and its financial committees. Technically speaking, the checks did not, in the first instance, belong to the office or represent its funds; but having been drawn, used, and accepted in the manner stated, they in equity became the property of the office, and the drawers became bound to make them good to the office.

We concede that the use of these checks by Fain indicates that he had already misappropriated the funds represented by them; but that fact gives the "check-men" no protection, for they by their checks voluntarily bound themselves to make good the default, and they cannot now throw off the responsibility then assumed.

By receiving back their checks without consideration, and after final default for a much greater sum, the "check-men" made themselves debtors to the office to the same extent as if they had borrowed so much money under the orders of the Court. Therefore, they are each *primarily* liable for the amount of his check with interest.

*Fifth.*—Some of the sureties on Fain's bonds assign error on the decree as to the "check-men," and insist that they should be held liable for *more* than the amount of their respective checks with interest, on the ground that *more* damage was done by the use of the checks.

There are several conclusive answers to this

assignment. (1) It does not appear that greater damage was done by the use of the checks, though used more than one time. (2) Complainants, in their bill, seek to charge the "check-men" only with the amount of their checks and interest. Broader relief than that granted would have been unauthorized under the bill. (3) The sureties now complaining laid no ground for a larger recovery by cross-bill or otherwise.

*Sixth.*—An exception was filed to the report of the Clerk and Master made in this cause, on the alleged ground that it was prepared by N. J. Phillips, a party to the suit, as one of the sureties on the special receiver's bond in the "Hopkins case." The ground of this exception was disclosed by affidavit filed in its support. The Chancellor overruled the exception, and on his action in so doing several assignments of error are made. His action was right. The record shows the report as made and filed to have been the report of A. F. Martin, the Clerk and Master of the Court. If it be true that he employed Phillips, a party to the suit, as his amanuensis in the preparation of the report, that is a matter of no consequence as touching the validity of the report. No improper conduct on the part of Phillips is shown or claimed. Moreover, this exception, being upon the validity of the report as a whole, was waived by a failure to bring it to the attention of the Chancellor until after his "judgment had been invoked on all other questions and

exceptions, and after the Court had passed upon same."

*Seventh.*—The other assignments of error are not well taken.

The decree will be modified as herein indicated, and otherwise affirmed.