## THIRD NATIONAL BANK OF ST. LOUIS, Respondent, W. J. REICHERT, Appellant.

### St. Louis Court of Appeals, March 31, 1903.

1. **Bills and Notes**: ESTOPPED FROM DENYING CONSIDERATION ON GROUND OF FRAUD: BANK EXAMINERS. Even if it be admitted that the note was acquired after maturity, that would not help the defendant, whose defense is, that it was executed in a manner intended to deceive the bank examiners, and mislead and deceive an innocent purchaser thereof, by reason of the proposed secret connivance of the defendant, that he would not be expected to pay the note unless the milling enterprise made the money out of which to pay it. Parties have been estopped from making similar defenses to commercial paper, and the same rule should apply in this case.

2. ———: CONSIDERATION THEREFOR, AMPLE. Where a national bank, which had acquired a flouring mill, entered into a business arrangement with defendant for the organization of a corporation to own and operate the mill, which contemplated the giving of certain notes by defendant in payment for stock, and also that defendant should run the mill, and have the privilege of

acquiring the entire business, and that the bank should lend the milling company the capital required to operate the mill. *Held*, that the notes so given were based on a sufficient consideration, by reason of the agreement between the parties to undertake the enterprise.

3. ———: COLLATERAL AGREEMENT, NO DEFENSE. Where a note sued on was payable absolutely without condition, the maker was not entitled to urge as a defense, a parol agreement that the note was only to be paid contingently in the event enough money was earned by a certain milling corporation to pay the same.

4. ———: WRITTEN INSTRUMENTS: PAROL AGREEMENTS. Promissory notes are written instruments and can not be varied by extraneous oral agreements.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan*, Judge.

AFFIRMED.

*Turner & Holder* and *Frank E. Richey* for appellant.

(1) Under the uncontradicted evidence in the case the plaintiff was not a bona fide holder for value and before maturity of the note sued on, so as to preclude the defense of a want of consideration. (2) The note sued on was transferred, i. e., both indorsed and delivered, to the plaintiff, after the maturity of the note, and the plaintiff therefore holds it subject to all defenses that could have been set up as against the transferrer. Kellogg v. Schnaake, 56 Mo. 136; Lee v. Turner, 15 Mo. App. 205; Julian v. Calkins, 85 Mo. 202; Turner v. Hoyle, 95 Mo. 337. (3) The uncontradicted evidence establishes the defense that there was no consideration for the original note of which the note sued on was a renewal note, and the original note having been given without any consideration, the renewal note was without consideration. Comings v. Leedy, 114 Mo. 454; Twile v. Sargent, 63 Minn. 218; Bank v. Barmann, 124 Ill. 200; Tiedeman on Com. Paper, sec. 180; 1 Daniel on Neg. Inst. (3 Ed.), secs. 179, 205, 206.

*Dawson & Garvin* for respondent.

(1) A failure or want of consideration may be shown under the Missouri law (R. S. 1899, sec. 645). Where such defects of consideration appears, it of course destroys the obligation or promise to pay which the note contains. But testimony of a want of consideration is quite different in legal effect from proof which undertakes to defeat such an instrument by some agreement in conflict with its other terms. The latter testimony is not competent of itself, nor is evidence to show a condition (in the nature of a defeasance) not expressed in the instrument admissible to defeat its purpose. Jones v. Jeffries, 17 Mo. 577; Smith's Adm's. v. Thomas, 29 Mo. 307; Massmann v. Holscher, 49 Mo. 87; Rodney v. Wilson, 67 Mo. 123; 29 Amer. Rep. 499. (2) The plaintiff in this case is the indorsee or assignee of a negotiable promissory note, perhaps before maturity, and certainly for full value without knowledge of any condition. (3) We cite the following cases to the general proposition that the judgment in this case is for the right party and should be affirmed: Bank v. Graham, 74 Mo. App. 251; Jennings v. Todd, 118 Mo. 296; Bank v. Pikin, 66 Mo. App. 592; Hurt v. Ford, 142 Mo. 283; Barnes v. McMullens, 78 Mo. 260.

GOODE, J.—Action on a negotiable promissory note for $2,750, executed by the appellant to the Chemical National Bank of St. Louis, on the thirteenth day of August, 1896, due six months after date and given in renewal of a previous note for the same amount on February 10, 1896. The petition avers that the instrument in suit was indorsed and delivered by the Chemical National Bank to the respondent, the Third National Bank of St. Louis, for value and before maturity, while the answer avers that the appellant received no consideration for the note, and that, in fact, there was no consideration for it; further, that the respondent

was not a purchaser in good faith before maturity but came into possession of the note long after it was due and otherwise than by purchase.

Complaint is made of the refusal of certain declarations of law by the circuit court; but the declarations need not be recited because we think no defense to the respondent's case was shown and that the judgment was for the right party.

The Third National Bank of St. Louis purchased the assets of the Chemical National Bank of said city, the purchase being the outcome of negotiations and transactions which began anterior to January 13, 1897, and were finished by the removal of said assets to the respondent's banking house on the twenty-eighth day of February. The latter date fell about two weeks after the maturity of the note in controversy and that fact is relied on as showing that the respondent did not acquire it in the ordinary course of business before maturity but subsequently; and hence that any equity appellant may have against the note is available as a defense to the respondent's action.

The officers of the Third National Bank on January 13th, made a verbal agreement to purchase the assets of the Chemical Bank for the Third National Bank, if, on examination, they were found to be satisfactory. The examination was made January 18th and the purchase then definitely arranged so far as the principal officers of the two banks could arrange it; but the terms of the deal were not put into writing until January 30th, when an instrument was drawn up and signed by the officers of the banks providing for the purchase of the assets, furnishings, good will, fixtures and property of all kinds of the Chemical Bank by the Third National for $475,000, the agreement being based on a statement of the condition of the Chemical Bank's affairs rendered on January 18th. Said instrument provided that the officers of the two institutions should procure approval of its terms by their boards of directors and

that it should be carried out in accordance with the provisions of the Federal National Bank Act, the transfer of the assets to be made on or before March 1st. At the time the sale was negotiated, appellant's note was among the assets of the Chemical Bank and was passed at its face value by the officers of the Third National, without any information or notice coming to them that it was other than what it purported to be; namely, an ordinary promissory note not yet due, held by the Chemical Bank as one of its bills receivable. It unquestionably constituted part of the consideration moving the Third National Bank to make the purchase, as the testimony shows it was regarded as gilt-edged paper.

The testimony of the officers of the Third National tends to show that the assets and property of the Chemical were transferred to the former institution and actually delivered on or about the thirtieth day of January, but that they were not physically removed from one banking house to the other until February 28th.

The facts out of which the supposed equitable defense of the appellant arises are connected with the organization of the milling company in the State of Illinois to operate a mill at LaGrange, Missouri. The appellant, W. J. Reichert, and his brother, George Reichert, were the controlling owners of the capital stock of the Reichert Milling Company, which was engaged in manufacturing flour in Freeburg, Illinois. Said concern kept a bank account with the Chemical National Bank of St. Louis, enjoyed a line of credit with said bank, and the officers of the two corporations seem to have been on friendly terms. Sometime in 1895, the Chemical Bank acquired the property of the LaGrange Milling Company at La Grange, Missouri, on account of having loaned this company money secured on its milling plant and being forced subsequently to take the plant. The title to said plant was put in the name of William E. Garvin to hold for the Chemical Bank. J. C. Richardson and Francis Kuhn were president and

vice-president of the Chemical Bank and after this property had been taken over by the bank, said officers, in order to make it productive, opened a negotiation with the Reicherts and proposed that the Chemical Bank or its officers and the Reicherts should operate the LaGrange plant together, as the latter were practical millers. The result of that negotiation was that the Climax Milling Company was organized under the laws of the State of Illinois with a capital stock of $15,000, which was paid by Garvin conveying to it the mill and machinery of the defunct LaGrange Milling Company. Of the one hundred and fifty shares of capital stock of the Climax Milling Company, Richardson and Kuhn took thirty-five shares each, W. J. Reichert and George Reichert, thirty shares each, C. A. Whittaker fifteen shares, and Walter J. Serth five shares. Whittaker and Serth had been employees of the Reicherts in the Freeburg mill, but after the organization of the Climax Milling Company, the former took charge of that enterprise, as it was understood they should when the plan to operate the LaGrange property was arranged. The Climax Milling Company continued business for seven or eight months and then stopped, as it lost money all the time.

When said company was organized, W. J. and George Reichert each executed a promissory note for $2,750 to the Chemical National Bank to pay for the shares of stock taken by them, which included the twenty shares put in the names of Whittaker and Serth, who gave their notes to the Reicherts for their shares; that is to say, the Reicherts subscribed for eighty shares of the total of one hundred and fifty shares and sold twenty shares to Whittaker and Serth. They also took the following contract binding Richardson and Kuhn to sell them the other shares:

"Freeburg, Illinois, Jan. 31, 1896.
"This agreement is that Wm. J. Reichert and

George Reichert are to have eighty shares of Climax Milling Company for $5,500 and agree to resell to the Reicherts within fifteen months, our seventy shares for the sum of $7,000 and if bought we agree to waive all profits except six per cent interest.

"J. C. RICHARDSON,<br>"FRANCIS KUHN."

When the original notes given by the Reicherts to the Chemical Bank matured, renewal notes were executed and the instrument sued on is one of the renewals.

The position of the respondent is that his original note was given pursuant to an understanding and agreement between him and the officers of the Chemical Bank that he was not to be bound for its payment, but that it was to be paid out of the earnings of the Climax Milling Company; that in fact it was an accommodation note and the entire arrangement was entered into by him and his brother George at the solicitation of the officers of the Chemical Bank for the convenience of the latter institution and so that it might utilize its La-Grange property, keep its assets in presentable condition and have the two notes given by the Reicherts to exhibit to the national bank examiner as solvent assets. That is substantially the testimony of the Reicherts and of Becker, a bookkeeper of the Freeburg mill, who says he heard the arrangement made; but it is disputed by the respondent, and there is testimony the other way. Becker's version of the affair, which is in all respects like that given by the appellant himself, is as follows:

"He [Richardson] came out there one morning on the nine o'clock train and came down to the mill. Mr. Reichert and myself were in the office, and he came in and shook hands and said, 'How do you do,' and said, 'Mr. Reichert, we are stuck;' they talked a while and he said, 'What is the matter?' He said, 'We are stuck on a mill and we want you folks to help us out;' so

he said, 'What do you want to do?' He told him they wanted to buy in the property, wanted to form a stock company and run the mill again. He asked him what mill it was and he said it was the LaGrange Milling Company at LaGrange, Missouri; and Mr. Reichert asked him how the mill was and the location and everything, and the way he explained it, it was a good mill and a good country. Mr. Reichert told him, well, before he could do anything he would want to see the property and see the location of it, and I think right after that Mr. Reichert went up there, and Mr. Richardson came out again and asked him whether he was ready to form a stock company and he said —

"By the Court: Q. Are you speaking now of another interview; you said Mr. Reichert went up there, do you mean went to LaGrange? A. Yes, sir.

"Q. Have you told us all that passed at the first interview beween Mr. Richardson and Mr. Reichert? A. The first time he was out there?

"Q. Yes, sir? A. No, sir.

"Q. Tell us what else passed? A. Mr. Reichert told him they had their hands full and did not want to go into any more business, they had a large mill that was all he wanted, and at the same time he asked him what they required of him, and he told him that they would organize a stock company and give them so many shares, and they would have to hold that for the Chemical National Bank, and wanted their notes, wanted his note and his brother's note. He said he did not like to go into that and Mr. Richardson the same time always told him 'You will not be liable for a cent; you give us your notes and the money that you will have to pay these notes with will have to be made at the mill at LaGrange before you have to pay them.' Mr. Richerts said, 'Well, that is a pretty fair offer;' he said, "If you insert that in the notes we wouldn't mind taking hold of it and trying it.' He told him as a National bank, that would be impossible; when the ex-

aminer comes around he would see that on the note and would pass on it; they couldn't hold such a note. Mr. Reichert said that would be the only way that they could go into it. . . . He said that it would be impossible, that he could take his word for that; that they would be protected; and he told him, too, that they would not have to pay a cent until the money was made out of the mill up there. He said that they would start up in business and if they made any money these notes would be paid out of the money made at the LaGrange mill; that he himself would not be liable for one cent; that he had nothing at stake whatever. Those are the words he told him. He said, 'We are stuck up here and want you folks to help us out; we know you are experienced millers and know that you folks can help us out on that mill.

"Q. Have you stated all that he said as to why he wanted it in this shape? A. Well, I think I did, because he told him it could not be put in the note because it was a national bank, and when the examiner comes around he would throw that note out and not pass on it.

"Q. Was there any other conversation that you heard after that time? A. No, I don't think there was.

"Q. Repeat again, Mr. Becker, what you said he said as to how these notes were to be paid? A. He said that 'You will not be liable for one cent; that this note will be paid out of the proceeds of the Climax Milling Company.' Mr. Richardson told Mr. Reichert —Mr. Reichert had a clause written out saying, 'This note is to be paid out of the proceeds of the mill at La-Grange only' and Mr. Reichert laid that before Mr. Richardson and asked him to insert that in the note and Mr. Richardson said, 'No, we can not do that, it is against the laws of Missouri, and if we insert that in the note and the bank examiner comes around he would not accept that note; but you can take my word for it, you won't be liable for one cent.'

"Q.  Is that all that he said about the paying of the note?  A.  Yes, sir; I think it was."

Some letters were introduced which throw light on the true nature of the agreement, among others the following:

"Freeburg, Ill., Nov. 7, 1895.

"Mr. J. C. Richardson,

St. Louis, Mo.

"Dear Sir:  Referring to our conversation of yesterday, beg to say we can not sign the agreement the way you have it written, but will go in with you provided you insert the following clause: 'The Chemical Nat'l. Bank also agrees to loan the Reicherts $10,600 on their notes at four months time—payable only upon condition that the money is made out of the mill at LaGrange, Missouri, only—the Reicherts not to be personally liable.'  The above clause also to appear in the notes which we are to give for $10,600.

"If the foregoing is not satisfactory to you, then go ahead and buy the mill and we will lease it from you for one year with the option of renewing the lease at end of first year, or to buy the mill at any time at whatever price we can agree upon.

"If you accept any one of these agreements, my brother and Mr. Whittaker, our head miller, will go to LaGrange Friday night.        Yours truly,

"W. J. REICHERT."

"Freeburg, Ill., Dec. 4, 1895.

"Mr. J. C. Richardson,

St. Louis, Mo.

"Dear Sir:  After considering and reconsidering, we have come to the conclusion that we are not able to go in with you at LaGrange; unless as per our written proposition of October [Nov. 7th] 7, 1895.

"Mr. Buehler is a good office man and a first-class flour salesman, and if he takes stock in the mill you will have a good man.

"With best wishes, I am,

"Yours truly,

"W. J. REICHERT."

The Chemical Bank refused to put such a clause in the notes as the Reicherts demanded, and whatever proof there is in regard to an agreement that the notes should not be paid according to their tenor is verbal.

The circuit court rendered judgment in favor of the Third National Bank.

According to the testimony relied on by the appellant, he executed the note in question for the distinct purpose of imposing on any national bank examiner who might investigate the condition of the Chemical Bank. Such examinations are made for the good of stockholders and the public generally. They are the means prescribed by law to keep national banks in sound condition, prevent losses by improvident or dishonest managers to stockholders and customers, maintain public confidence in those institutions and a stable condition of the country's finances. It is a serious question whether appellant is not estopped to interpose the defense of lack of consideration for a note given in the circumstances and for the purpose he says he gave this one. Granting that it was acquired by the respondent after maturity, as it was executed by the appellant to deceive the officer whose duty it was to scrutinize the bank's assets, appellant occupies a weak position on which to withstand the demand of the respondent, which was innocent of actual knowledge of the facts and would fall a victim to a scheme contrived by other persons to evade the law. Makers of commerical paper who acted from similar bad motives have been held estopped to defend on the ground of want of consideration. Mead v. Nat'l Bank, 34 N. Y. Supp. 1054; Winton v. Freeman, 102 Penn. St. 366; Longmire v. Fain,

89 Tenn. 393; Howard v. Palmer, 64 Maine 86; Leggett v. Goodrich, 20 La. Ann. 165. The rule is probably universal that a person who engages in a fraudulent transaction will be left without relief from a hurtful consequence which may befall him.

But there was a consideration for the note. Appellant and the Chemical National Bank entered into a complicated business arrangement which contemplated the giving of appellant's note to said bank; contemplated likewise that the Reicherts and their employees should take charge of and run the LaGrange milling plant and that the Reicherts should have the privilege of acquiring the entire business; also that the Chemical Bank should lend the Climax Milling Company the capital required to operate its mill. The consideration for the note was the agreement of the parties to undertake that enterprise, which was carried out in all its details. In view of such facts the plea of want of consideration is baseless. Given v. Corse, 20 Mo. App. 132; Madison County Bank v. Graham, 74 Mo. App. 251; Ridenbaugh v. Young, 145 Mo. 274; Kansas City School Dist. v. Sheidley, 138 Mo. 672; Lindell v. Rokes, 60 Mo. 249; Tureman v. Stephens, 83 Mo. 218.

The defense attempted was not want of consideration, but a side agreement that the note was not to be paid absolutely according to its tenor, but only contingently in the event enough money was earned by the Climax Milling Company to pay it, and that if sufficient money was not earned it should not be paid at all. This was nothing more nor less than an attempt to engraft on a written contract a verbal stipulation opposed to the terms of the instrument itself; a verbal stipulation, too, which appellant had first demanded be written in the note and afterwards waived that demand when the bank refused to accede to it. That such a defense can not be made to a promissory note has been decided many times. Trustees of Christian University v. Hoffman, 95 Mo. App. 488; Jones v. Jeffries, 17

Mo. 577; Smith's Admrs. v. Thomas, 29 Mo. 307; Unseld v. Stephenson, 33 Mo. 161; Massman v. Holscher, 49 Mo. 87; Rodney v. Wilson, 67 Mo. 123; Ewing v. Clark, 76 Mo. 545; Kulenkamp v. Groff, 71 Mich. 675; Hyde v. Tenwinkel, 26 Mich. 93; McKegney v. Widekind, 6 Bush. (Ky.) 107; Gillett v. Ballou, 29 Vt. 296; Walters v. Smith, 23 Ill. 342; Hubbard v. Marshall, 50 Wis. 322.

The judgment is affirmed. *Bland, P. J.,* and *Reyburn, J.,* concur.